UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 17-cv-60323-DPG

**THE MARITIME EXECUTIVE, LLC**, a
Florida corporation,

    *Plaintiff,*

vs.

**LARSON ELECTRICS, LLC**, a Texas
corporation, and **ROBERT BRESNAHAN**, an
individual

    *Defendants.*
_____/

## AMENDED COMPLAINT

Plaintiff, The Maritime Executive, LLC, hereby sues Defendants, LARSON ELECTRICS, LLC and ROBERT BRESNAHAN, and alleges as follows:

### JURISDICTION, PARTIES AND VENUE

1. This is a claim for damages in excess of $15,000, exclusive of interest, attorneys' fees, and costs.

2. Plaintiff, THE MARITIME EXECUTIVE, LLC (hereinafter "TME"), is a Florida corporation, which at all material times, conducted business within Broward County, Florida. TME is a journalistic publisher of content regarding the maritime industry.

3. Defendant, LARSON ELECTRICS, LLC (hereinafter "LARSON") is a Texas limited liability company and conducts substantial business in the state of Florida.

4. ROBERT BRESNAHAN ("BRESNAHAN") is owner and managing member of LARSON.

1

5. The Court has jurisdiction and venue is proper in this judicial district for, among other reasons, the cause of action occurred in Broward County, Florida and the Defendant intentionally defamed the Plaintiff knowing that injury to the Plaintiff would result in Broward County, Florida.

6. The defamatory statements and advertisement which are described in further detail below, were published on websites that were accessible in Florida. Specifically, the defamatory statements and advertisements were accessible in Florida, and were in fact accessed in Florida by the Plaintiff's customers and potential customers located in Florida.

7. The defamatory statements and advertisement were accessed by Florida residents, corporate entities located in Florida, and Florida customers, including but not limited to SEACOR Holdings Inc., Molly Hottinger, Tim Gundry, Craig Gundry, Fassmer Service America, LLC, Tim Green, Mick Tansey, Flagship Management, Eric Smith, Hendry Marine Industries, Inc., and Clive Bullard.

8. All conditions precedent to the maintenance of this action have occurred, been satisfied and/or waived.

## GENERAL ALLEGATIONS

9. In approximately January of 2016, TME entered into an agreement with LARSON by which TME would publish advertisements for LARSON in TME's maritime journal.

10. From January of 2016 to December of 2016, TME performed its obligations under the Agreement by publishing the agreed upon advertisements for LARSON.

11. LARSON failed to pay for the services rendered.

12. TME attempted to collect on the debts owed by LARSON.

13. LARSON and BRESNAHAN retaliated against TME by intentionally publishing defamatory statements against TME with the intentions of harming TME's business.

14. These defamatory statements include, but are not limited to, the following:

   a. [TME} provided contact information associated with lead generating digital campaigns purported to be interested prospects, but ... many of those prospects have responded that they did not click on the ads and do not read Maritime Executive. Many more are simply not valid or are not in use.

   b. Many [people who clicked on TME's ad] do not read Maritime Executive in any form and did not click on the links in their digital campaigns seeking more information.

   c. Many [of the advertising leads' e-mail addresses] are not valid and the valid ones are unanimously saying they do not recognize Maritime Executive and had no interest in the product .... These same issues seem pervasive throughout the non-legal lead data as well."

   d. [W]e have withheld paying for these campaigns because either they didn't happen or the activity generated from campaign appears to me as either erroneous at best and fraudulent at worst.

See Defamatory Publication, attached hereto as Exhibit "A."

15. LARSON and BRESNAHAN also purchased an advertisement on the widely used search engine, Google, which linked to the above publication.

16. The ad specifically labels TME as a "scam." See copy of Advertisement, attached hereto as Exhibit "B."

17. LARSON's Advertisement on Google became the first link to appear when users searched certain words associated with TME, including the name of TME's publication, officers, and employees.

18. LARSON knew these publications would be, and were, published in other maritime news journals, including certain publications that directly compete with TME.

19. The publication and advertisement has resulted in numerous inquiries from TME's paid advertisers and a loss of ad revenue and damages to Plaintiff.

### COUNT I: DEFAMATION (LARSON)

20. All allegations of paragraphs 1-19 are incorporated herein by reference.

21. A cause of action for defamation under Florida law has accrued because of LARSON's libelous and slanderous statements.

22. The written statements made by LARSON were false and defamatory.

23. LARSON knew that the statements were false or acted with reckless disregard of the falsity of the statements.

24. As a direct and proximate cause of the false and defamatory statements, Plaintiff has been damaged.

WHEREFORE, Plaintiff demands judgment of damages and court costs against Defendant and such other relief as this Court deems just and appropriate.

### COUNT II: DEFAMATION *PER SE* (BRESNAHAN)

25. All allegations of paragraphs 1-19 are incorporated herein by reference.

26. A cause of action for defamation under Florida law has accrued because of LARSON's libelous and slanderous statements which were published in the state of Florida.

27. The written statements made by LARSON were false and defamatory.

28. The statements made by LARSON impute acts of criminal behavior, including but not limited to fraud, against TME and impute conduct and characteristics incompatible with the proper exercise of the lawful business, trade or profession of TME.

29. Moreover, one or more of the statements in question were specifically published to clients of TME and/or where business associates of TME could access and read them.

30. LARSON published such statements recklessly and in conscious disregard of the truth. Further, LARSON made such statements maliciously, oppressively and fraudulently, with ill will and evil intent to defame and injure TME.

WHEREFORE, Plaintiffs seek a judgment of exemplary damages plus court costs against LARSON and such other relief as this Court deems just and appropriate. Plaintiff reserves the right to amend this Complaint to include punitive damages.

## **COUNT III: DEFAMATION (BRESNAHAN)**

31. All allegations of paragraphs 1-19 are incorporated herein by reference.

32. A cause of action for defamation under Florida law has accrued because of BRESNAHAN's libelous and slanderous statements.

33. The written statements made by BRESNAHAN were false and defamatory.

34. BRESNAHAN knew that the statements were false or acted with reckless disregard of the falsity of the statements.

35. As a direct and proximate cause of the false and defamatory statements, Plaintiff has been damaged.

WHEREFORE, Plaintiffs demand judgment of damages and court costs against BRESNAHAN and such other relief as this Court deems just and appropriate.

5

## COUNT IV: DEFAMATION *PER SE* (BRESNAHAN)

36. All allegations of paragraphs 1-19 are incorporated herein by reference.

37. A cause of action for defamation under Florida law has accrued because of BRESNAHAN's libelous and slanderous statements which were published in the state of Florida.

38. The written statements made by BRESNAHAN were false and defamatory.

39. The statements made by BRESNAHAN impute acts of criminal behavior, including but not limited to fraud, against TME and impute conduct and characteristics incompatible with the proper exercise of the lawful business, trade or profession of TME.

40. Moreover, one or more of the statements in question were specifically published to clients of TME and/or where business associates of TME could access and read them.

41. BRESNAHAN published such statements recklessly and in conscious disregard of the truth. Further, BRESNAHAN made such statements maliciously, oppressively and fraudulently, with ill will and evil intent to defame and injure TME.

WHEREFORE, Plaintiffs seek a judgment of exemplary damages plus court costs against BRESNAHAN and such other relief as this Court deems just and appropriate. Plaintiff reserves the right to amend this Complaint to include punitive damages.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable as of right.

        Respectfully submitted,

        **WHITELOCK & ASSOCIATES, P.A.**
        300 Southeast Thirteenth Street
        Ft. Lauderdale, FL 33316
        Telephone: (954) 463-2001
        Facsimile: (954) 463-0410
        Counsel for Plaintiffs

        s/Christopher J. Whitelock
        CHRISTOPHER J. WHITELOCK
        Florida Bar No. 67539
        Email: cjw@whitelocklegal.com
        DAVID S. FRANK
        Florida Bar No. 93906
        Email: davidfrank@whitelocklegal.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2018, I electronically filed the foregoing document with the Clerk of Court using CMECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Filing.

        s/Christopher J. Whitelock
        CHRISTOPHER J. WHITELOCK

## SERVICE LIST

Stephanie M. Chaissan, Esq.
Alice K. Sum, Esq.
FOWLER WHITE BURNETT, P.A.
Brickell Arch, Fourteenth Floor
1395 Brickell Avenue
Miami, Florida 33131
Email: asum@fowler-white.com
Email: schaissan@fowler-white.com

# EXHIBIT "A"

12/19/2016 — Larson Electronics Severs Ties to Maritime Executive and their Bogus Lead Generation Program

Register Here | Login | My Account | Shopping Cart | Customer Service | Search | Items in Cart (0)

Join our Mailing list
1-800-369-6671 or 903-498-3363
(Military/Intl Sales - 214-616-6180)
Live Support >>> ONLINE

facebook

Free UPS Ground Shipping on List Price Orders Over $100 in Domestic US (Not HI/AK/CAN)
Most Items in stock for fast shipping!! UPS Ship Map Credit cards & Paypal Accepted

Home | Customer Service | News Articles Blog | Distributors | Explosion Proof Lights | GoLight | LED Lights | MegaTower | Military | Spotlights | Searchlights | Testimonials | Mailing List/Catalog

Home - News Bulletins

You're NOT logged in, Please log in

10/20/16

**Larson Electronics Severs Ties to Maritime Executive and their Bogus Lead Generation Program**

Citing lead data issues, Larson Electronics announced that it cancelled its advertising contract with Maritime Executive, who distributes a print magazine, digital newsletter and a website under the Maritime Executive name. In reviewing referring links and tracking links imbedded in online ads via Google Analytics, the resulting net sales activity of all campaigns in 2016 was zero. Maritime Executive provided contact information associated with lead generating digital campaigns purported to be interested prospects, but after Larson review, many of those prospects have responded that they did not click on the ads and do not read Maritime Executive. Many more are simply not valid or are not in use.

Larson Electronics, a manufacturer of explosion proof lighting, portable power distribution systems and light tower systems, ended the relationship with publisher Maritime Executive after a comprehensive review of sales response to a variety of digital campaigns, including e-blasts, e-newsletters and web ad placements. Some of these digital programs produce "leads", which Maritime Executive indicates are people who clicked on Larson ads within their digital campaigns, presumably because they were interested in learning more about the product.

"There are so many issues with Maritime Executive; it is hard to wrap my head around them all," said Rob Bresnahan with Larson Electronics LLC. "It is not clear yet whether all campaigns we were billed for actually ran, but we definitely have issues with the leads generated by the campaigns that did run. This year, we are pretty aggressive about following up with these leads to further the sales of our products. The goal of advertising is to garner more dollars of margin from the advertisement, than the ad itself cost. In looking over the leads from Maritime Executive, we noticed that we received email only data. This is unusual. Typically, we get full contact data for leads. We also noticed several hundred leads from attorneys at large firms. We advertised explosion proof LED lights for hazardous location areas in these campaigns. These are products that make sense for tankers, refineries, chemical processing centers and docking areas where oil and other chemicals are routed on and off transport vessels. Not lawyers. For example, we had 7 partners from one firm 'respond' to one ad in one e-newsletter on one day. It just would not happen. As we dug deeper, we learned that the large global firms typically list out all their people on their sites, including name, email and phone number of every associate and partner. In calling and emailing these 'leads', we have found that many do not read Maritime Executive in any form and did not click on the links in their digital campaigns seeking more information (as we would expect). Moreover, email responses have shown that many of these attorneys left these firms years ago; many of the emails are not valid and the valid ones are unanimously saying they do not recognize Maritime Executive and had no interest in the product. Many of these firms have automatic email responses indicating how long it has been since this particular person left the firm. When I look over today's responses, I see 2011, 2012, etc. We are working through more than 2500 'leads' that were supposedly generated in 2016 and I have our people documenting each response. These same issues seem pervasive throughout the non-legal lead data as well."

Rob continued, "Maritime Executive promotes the concept of audited total gross contacts. We need to understand more about what 'audited' in that context means, but I can tell you that this list is not what we signed up for and we know for a fact already that a statistically significant amount of these folks in these lists we were given as leads are not Maritime Executive readers and never clicked on our ad in any of their campaigns. Naturally, this leads us to the traffic statistics problem. If these people are the ones clicking on our ad in their digital campaign and coming to our site, how is that possible when these people don't exist, don't read Maritime Executive or stopped using that email 5 or 6 years ago? How is this traffic being generated? It would certainly explain the average page views of one, but the question remains, who or what is generating the traffic? Whatever the answer to that question is, this does explain why there are no conversions, no smart goals and no referring links for any sales, etc. For that reason, we have withheld paying for these campaigns because either they didn't happen or the activity generated from campaign appears to me as either erroneous at best and fraudulent at worst. We have given the folks at Maritime Executive a summary of our analysis of these campaigns, but their response so far has included posting derogatory statements about our company and me on the Web, screaming obscenities at one of the order processing people here and implying a physical confrontation (which, by the way, I would be delighted to accommodate)."

Larson Electronics carries an extensive line of LED light towers, portable power distributions, explosion proof lights for hazardous locations, portable work lights and industrial grade LED area lights. You can view the company's entire catalog of products by visiting them on the web at Larsonelectronics.com. You can also call 1-800-369-6671 to learn more about their products or call 1-214-616-6180 for international inquiries.

SEARCH
Search:
Company Information
SEARCH
Product #1
BROWSE BY CATEGORY

• Black Friday & Cyber Monday Specials
• Explosion Proof Lights
• Industrial and Vaporproof Emergency Failsafe Lighting
• Industrial Cord Reels and Tool Taps
• Megatower
• Rig Lights
• Stadium lights
• String Lights and Temporary Light Stringers
• Tank Cleaning Lights
• Vapor Proof LED Lights
• Workboat Light Fixtures & Lighting Equipment
• Color Changing LED RGB Lighting
• Explosion Proof Cord Reels
• GOLIGHT Spotlights
• Remote Area Lighting and Scene Lights
• Utility Bucket Mount, Receiver Hitch & Trailer Mount Lighting
• Butane and Solvent Extraction Room Lighting and Equipment
• Explosion Proof Fans & Blowers
• Explosion Proof Paint Spray Booth Approved Lights
• Explosion Proof String Lights
• Fleet Service Lights and Lighting Equipment
• Industrial Handlamps & Droplights
• LED Blasting Lights
• Night Time Fishing Lights
• Portable Power Distribution Panels
• Power Distribution Panels with KVA Transformers
• Service Pit Lighting
• Solar Powered LED Lights
• Agricultural Farm Equipment Lighting & Beacons
• Explosion Proof Cameras & Surveillance Systems
• Explosion Proof Emergency Lights
• Garage & Gas Station Canopy Lights
• LED Lights
• NDT Ultraviolet Lights
• Portable Hazardous Location Lighting
• ATEX Rated Explosion Proof Lights
• Automotive Lighting
• Hazardous Location Area Lights and Portable Lighting
• HID Equipment Lights
• Hunting Lights
• Industrial Transformers
• Light Towers
• Outdoor Lighting
• Temporary Construction Lights
• Vehicle Mounted Spotlights
• Equipment & Heavy Machinery LED Light Package Fitouts
• 24 Volt Military Lights
• Disaster Relief / First Responders / Search & Rescue Lighting
• Plastic Handcuff Key

# EXHIBIT "B"

